468 June 5, 2012 No. 56

IN THE OREGON TAX COURT
REGULAR DIVISION

TEKTRONIX, INC.
and Subsidiaries,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4951)

Plaintiffs (taxpayer) appealed from a Magistrate Division decision as to application of the statute of limitations on deficiency assessments. Parties also addressed questions as to the proper computation of the sales factor used to apportion the income of taxpayer to Oregon for the 1999 tax year as related to goodwill. In granting taxpayer's motion for partial summary judgment, the court ruled that ORS 314.410(3)(b) did not authorize the department to assert a deficiency in the 1999 tax year based on federal action for 2002, and that the net gain from the disposition of goodwill should not enter into the calculation of the sales factor for the 1999 year of taxpayer.

Oral argument on cross-motions for summary judgment was held June 20, 2011, in the courtroom of the Oregon Tax Court.

Robert T. Manicke, Stoel Rives LLP, Portland, filed the motion and argued the cause for Plaintiffs (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant (the department).

Decision for Plaintiffs rendered June 5, 2012.

**HENRY C. BREITHAUPT, Judge.**

### I. INTRODUCTION

This matter is before the court on cross-motions for summary judgment, with that of Plaintiffs (taxpayer) being a motion for partial summary judgment. Taxpayer and Defendant Department of Revenue (department) are separated by differing views on the application of the statute of limitations on deficiency assessments. In addition, regardless of which party prevails on the limitations issue, there

remains a question as to the proper computation of the sales factor used to apportion the income of taxpayer to Oregon for the 1999 tax year.[1]

On the issues related to the statute of limitations, unless otherwise noted, reference is made to the 2005 edition of the Oregon Revised Statutes (ORS). As to computation of the sales factor, reference is made to the 1999 edition of ORS and the rules of the department in effect for 1999. References to the Internal Revenue Code of 1986, as amended, are abbreviated as "IRC."

ORS 314.380 and ORS 314.410 are important in the discussion of the statute of limitations issue. Each of those statutes makes reference to actions of the Internal Revenue Service (IRS) or officials of other states. In this matter no party relies upon any action by officials of other states and the discussion of ORS 314.380 and ORS 314.410 is undertaken only with respect to actions of the IRS.

## II.   FACTS

The facts in this case have been partially established by two stipulations, the first of which was submitted to the Magistrate Division prior to the special designation of this case to this division of the court. The second stipulation is referred to in this opinion as "Stip Facts." In addition taxpayer has submitted affidavits that have not been contested by the department by way of counter-affidavit.[2]

A.   *Taxpayer's Operations and the Sale of CPID*

Taxpayer was founded and incorporated in 1946 by C. Howard Vollum and Jack Murdock, the inventors of the first triggered oscilloscope, a device that tests and measures

---

[1] Referred to by the parties as the 1999 year, the period in question is the period ended May 27, 2000—the last Saturday in May of the tax year beginning in 1999. There is also reference to the 2002 year, a reference to the period beginning in 2002 and ended on the last Saturday in May of 2003.

[2] By letter dated February 14, 2012, the court inquired as to whether the parties could stipulate certain additional facts. By letter dated March 12, 2012, taxpayer responded that the parties were unable to enter into a stipulation but taxpayer submitted a supplemental affidavit of Mark Modjeski that, together with an attachment, addressed the facts about that the court had inquired. The department informed taxpayer that it took no position as to taxpayer's action or the submission of the supplemental affidavit of Mr. Modjeski.

voltage. Over time, taxpayer's Measurement Business Division ("MBD") manufactured other test, measurement and monitoring equipment, and taxpayer is a leading developer of test, measurement and monitoring equipment. In the 1970s, taxpayer expanded its high-tech business operations by acquiring all of the stock of The Grass Valley Group, Inc., a California corporation ("GVG"). GVG manufactured video disk recorders, business network computers and nonlinear digital editing systems, among other items. In 1996, GVG merged with and into taxpayer and, together with other businesses, subsequently operated as the Video and Networking Division ("VND"). In the early 1980s, taxpayer created a printer division to enable printing the output of an oscilloscope screen. This printer division eventually became CPID and generally manufactured high-end color printers. CPID operations grew over time, and taxpayer's activities related to the development and operation of CPID occurred in various jurisdictions around the world. As of the beginning of the 1999 tax year, taxpayer conducted its global business operations through these three divisions, MBD, VND and CPID, and these divisions engaged in a single unitary business throughout the world.

In 1999, taxpayer sold VND and CPID in separate transactions, of which the CPID sale was by far the larger. In June 1999, taxpayer announced its intent to spin off CPID to investors in a transaction pursuant to IRC § 355. After this announcement was made, however, Xerox Corporation, a New York corporation ("Xerox"), made an unsolicited offer to purchase CPID. On September 22, 1999, taxpayer and Xerox entered into an Amended Asset Purchase Agreement pursuant to which taxpayer sold to Xerox all of the assets used in CPID's trade or business operations. The sale transaction closed on January 1, 2000. Taxpayer received total gross proceeds of approximately $925,000,000 from the sale of CPID assets, which included real property, plant, equipment, and various tangible and intangible assets. Taxpayer recognized taxable gain of $589,834,393 related to the sale of goodwill. That goodwill, of prime importance in this case, will be referred to as "the goodwill."

Taxpayer created all of the intangible assets comprising the goodwill in activities and transactions in which

taxpayer claimed current deductions for the associated expenses, such as wages. Taxpayer had no tax basis in the goodwill. In general, the Goodwill reflected an accumulation of value over periods of time; it was not transitorily held, and it was illiquid in nature. In calculating its Oregon sales factor for the 1999 tax year, taxpayer excluded approximately $800 million from the sale of the CPID assets ($798,798,574 from the numerator and $800,731,519 from the denominator). Of the amounts in the numerator and denominator, $589,834,393 is the goodwill at issue in these motions.

B. *The Original and First Amended Oregon Tax Returns for the 1999 Tax Year*

Taxpayer applied for and received an extension of time within which to file the federal income tax return for the 1999 tax year. The extended due date for filing was February 15, 2001. Taxpayer timely filed its federal income tax return for the 1999 tax year on February 14, 2001.

Taxpayer timely filed its original Oregon corporation excise tax return for the 1999 tax year on March 15, 2001. In April 2001, the IRS commenced an audit of taxpayer's federal returns for the 1997 through 1999 tax years. On December 13, 2002, based on the outcome of the federal audit, taxpayer filed amended Oregon returns, listing $326,767 in additional Oregon tax for 1997, claiming an increase to taxpayer's net operating loss for 1998 and claiming a $987,213 refund for 1999.

Taxpayer did not enter into any agreement with the IRS extending the statute of limitations for assessment of deficiencies for the 1999 tax year. The department does not assert or rely on the existence of any agreement between the taxpayer and the department extending the statute of limitations for assessment of deficiencies for Oregon purposes.

Taxpayer was not engaged in the business of selling intangible assets like the goodwill (rather, as described above, taxpayer generally was engaged in the manufacture and sale of tangible personal property). Nonetheless, because taxpayer used the goodwill in its trade or business operations, taxpayer treated the gain from the sale of the goodwill as apportionable business income on the original

and amended Oregon returns for the 1999 tax year. In calculating its Oregon sales factor for the 1999 tax year, taxpayer determined that the occasional sale rule applied to the sale of the goodwill and thus excluded amounts received from the sale of the goodwill from the numerator and denominator.

As of December 13, 2002, the department had not made any adjustment to taxpayer's Oregon corporation excise tax return for the 1999 tax year. By check dated March 19, 2003, the department issued a refund to taxpayer in the amount of $698,533.91, reflecting the net Oregon corporation excise tax, including interest, owed to taxpayer for the 1997, 1998 and 1999 tax years.

C.  *2002 Tax Year Net Capital Loss and IRS Adjustment*

On February 17, 2004, and March 15, 2004, respectively, taxpayer filed original federal and Oregon returns for the 2002 tax year, reporting a net capital loss for that year. As described below, the IRS accepted the return for the 2002 tax year for processing, but the IRS ultimately disagreed with some of the amounts claimed on the return and audited taxpayer. For federal purposes, taxpayer claimed the benefits of the 2002 tax year net capital loss carryback with respect to the 1999 tax year by filing, on February 17, 2004, federal Form 1139, Corporation Application for Tentative Refund. The IRS issued to taxpayer the tentative refund that taxpayer claimed on its Form 1139, less a small amount owed for reasons unrelated to this case. Taxpayer did not file an amended Oregon return for the 1999 tax year at that time. Taxpayer did not specifically research whether Oregon tax law (or any other state's tax law) allowed a carryback for net capital losses. In addition, taxpayer was continually under examination by the IRS on a regular cycle, and the 2002 tax year appeared to be the last year of the cycle next to be examined. Accordingly, when taxpayer filed its original Oregon return for the 2002 tax year, taxpayer anticipated a federal audit and decided to wait until after the conclusion of that audit before undertaking a state-by-state investigation of the state tax treatment of the 2002 tax year net capital loss.

On March 28, 2005, the IRS concluded its audit of the 2000-2002 tax years and issued a Revenue Agent's Report making various adjustments. At the time of this audit, the IRS generally was time-barred from assessing additional tax for the 1999 tax year. However, the IRS could (1) assess any deficiency in any amount "attributable to" the application of the 2002 net capital loss carryback; and (2) assess any deficiency not attributable to the carryback up to the amount of the tentative refund. IRC § 6501(a), (h), (k). As a result of the audit, the IRS reduced the amount of taxpayer's net capital loss for the 2002 tax year and assessed taxpayer to recover a portion of the previously issued tentative refund. In doing so, the IRS used its authority under IRC § 6501(h) and assessed a deficiency "attributable to" the capital loss carryback. Taxpayer returned a portion of the tentative refund it had received with respect to the 1999 tax year. Taxpayer did not appeal the IRS's reduction of the 2002 tax year net capital loss or the resulting reduction in taxpayer's refund for the 1999 tax year. On April 21, 2005, taxpayer signed and filed IRS Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment.

D.   *Oregon Impact of the 2002 Tax Year Net Capital Loss*

On or around April 15, 2005 (*i.e.*, shortly before filing the IRS Form 870), taxpayer began to research the state implications of the federal audit, including whether taxpayer should amend state tax returns for prior years to obtain the benefits of the 2002 tax year net capital loss. On or about May 2, 2005, taxpayer's tax department completed a matrix that, in part, identified which states allowed the carryback of a net capital loss. Taxpayer determined that in many of the states that allowed net capital loss carrybacks the administrative costs of preparing amended returns were greater than the potential refund. Taxpayer did decide, however, to claim the benefit of the 2002 tax year net capital loss by filing amended returns for the 1999 tax year in four states in addition to Oregon: Arizona (amended return filed August 2, 2005), Delaware (amended return filed October 5, 2005), Virginia (amended return filed August 2, 2005) and Wisconsin (amended return filed July 13, 2005). Had

taxpayer not waited until after the federal audit of the 2002 tax year, it would have had to file five state refund claims twice—first in 2003 when taxpayer filed its original 2002 tax year returns, and then again in 2005 after the federal audit. By deferring until after the audit, taxpayer saved itself the costs of preparing the unnecessary first refund claims and saved the department (as well as the taxing authorities in Arizona, Delaware, Virginia and Wisconsin) from expending resources to process the unnecessary first refund claim.

On July 27, 2005, taxpayer filed an amended Oregon return for the 1999 tax year, on which for the first time it claimed a refund for the net capital loss carryback deduction from the 2002 tax year (*i.e.,* the Oregon Refund Claim). The Oregon Refund Claim was timely filed pursuant to a special rule applicable to refunds for net capital loss carrybacks. *See* ORS 314.415(5)(a).

E.  *The Department's Audit of the 1999 Tax Year*

On or about August 19, 2005, the department commenced an audit of tax years 1999, 2000 and 2001. On May 12, 2006, the department issued the Notice of Deficiency with an Explanation of Adjustments asserting that taxpayer had an additional Oregon tax liability of $3,700,328. The additional tax resulted solely from the department's increasing the numerator and denominator of taxpayer's Oregon sales factor each by $618,048,157. More than 95 percent of this increase relates to the goodwill, and this is the only portion of the increase at issue in this motion.[3]

As detailed in the Explanation of Adjustments, the department asserted that the Notice of Deficiency was timely because the federal audit caused subsection 3(b) of ORS 314.410(3)(b) to apply to the 1999 tax year, and thus reopened the 1999 tax year to audit. With respect to the increase in the Oregon sales factor related to the goodwill,

---

[3] The $3,700,328 of additional tax did not take into account any portion of the Oregon Refund Claim. After issuing the Notice of Deficiency, the department issued a Notice of Liability Balance, dated May 22, 2006. Pursuant to the Auditor's Report and Explanation of Adjustments included with this notice, the department reduced the Oregon Refund Claim to $369,200, which reduced the asserted $3,700,328 of additional tax liability to $3,331,128. As described above, the Oregon Refund Claim is not at issue in this motion.

the department asserted that the occasional sale rule applies "to the sale of fixed assets. The federal Schedules D's [*sic*] examined indicate the receipts in question were received for the intangibles and goodwill." The department asserted that the net gain from the sale of the goodwill was includable in the numerator and denominator of the Oregon sales factor pursuant to 6(b) and that the occasional sale rule did not affect this inclusion.[4] The department's deficiency assessment and its offset of the Oregon Refund Claim were based on a determination that taxpayer had improperly excluded certain types of gross receipts from its Oregon sales factor for the 1999 tax year. Taxpayer had excluded these categories of gross receipts from its Oregon sales factor on its March 15, 2001, original Oregon corporation excise tax return; its December 13, 2002, amended Oregon corporation excise tax return; and its July 27, 2005, amended Oregon corporation excise tax return. The department's determination substantially increased taxpayer's Oregon sales factor for the 1999 tax year, which substantially increased taxpayer's Oregon apportionment percentage and increased taxpayer's Oregon taxable income for the 1999 tax year.

### III.   ISSUES

There are two issues in this case at this stage:

(1)   Is the action of the department in respect of the 1999 year barred by the provisions of Oregon law regarding statutes of limitation, except to the extent of the refund claimed by taxpayer?

(2)   In any event, are the gross or net receipts recognized by taxpayer in respect of the disposition of certain assets in the nature of goodwill includable in the calculation of the sales factor as defined in ORS 314.665?

### IV.   ANALYSIS

This case is the latest in a series of cases addressing the complex and changing rules regarding the statute of limitations applicable to the issuance of deficiency notices

---

[4] Notwithstanding the actual text of its explanation of adjustments, the department in its brief to this court, while it relies on ORS 314.665(6)(a) asserts that it is not relying on ORS 314.665(6)(b). As will be apparent below, the court will address both paragraphs of that statute.

by the department. Here, as in many cases, the department asserts that its actions are timely only because of the application of ORS 314.410(3)(b)(A).[5]

Under ORS 314.410(3)(b) the analytical focus must start with the identification of the particular year for which the department made its assessment. This is so because the statute speaks of an action of the federal government that results in certain consequences (assessment of tax or issuance of a refund) that are linked, under the Oregon statute, to an action in Oregon (notice of a deficiency) occurring "for the corresponding tax year." ORS 314.410(3)(b)(A) The statute cannot be applied without identifying a particular federal tax year and then looking at what results may occur for the Oregon year that corresponds to the federal year and that occur "as a result of" a change or correction made by a federal official for the year being analyzed.

A. *Discussion of the 1999 and 2002 years of taxpayer*

1. *The 1999 year of taxpayer*

In this case the 1999 tax year is the year that must be tested to see if actions of federal officials resulted in assessment of tax or issuance of a refund at the federal level.[6]

---

[5] ORS 314.410(3)(b)(A) states:

"If the Commissioner of Internal Revenue or other authorized officer of the federal government or an authorized officer of another state's taxing authority makes a change or correction as described in ORS 314.380(2)(a)(A) and, as a result of the change or correction, an assessment of tax or issuance of a refund is permitted under any provision of the Internal Revenue Code or applicable law of the other state, or pursuant to an agreement between the taxpayer and the federal or other state taxing authority that extends the period in which an assessment of federal or other state tax may be made, then notice of deficiency under any Oregon law imposing tax upon or measured by income for the corresponding tax year may be mailed within two years after the department is notified by the taxpayer or the commissioner or other tax official of the correction, or within the applicable three-year or five-year period prescribed in subsections (1) and (2) of this section, whichever period expires later."

[6] This case is quite complicated, if for no other reason, because tax items from the 2002 year have some effect not only in that year but also in the 1999 year by reason of the operation of loss carryback provisions of Oregon and federal law. This makes a reference to a "corresponding tax year" both quite important and something requiring focused attention.

In determining the meaning of ORS 314.410(3)(b) the first question is whether, as to 1999, the federal changes and corrections that occurred in this case, occurring when they did, could have resulted in an "assessment of tax" for the 1999 year. As to this question, the court must determine what the Oregon statute means when it refers to an "assessment of tax" by a federal official.

One possibility is that the phrase refers to the assessment of an amount of tax in no way limited other than by the particular facts present in a year. However, another possibility is an "assessment of tax" could also include an assessment of an amount limited, under federal law, including the amount of a refund claimed by a taxpayer and which, in the words of ORS 314.410(3)(b)(A), could be "issued" to a taxpayer.

A review of ORS 314.410 and other relevant statutes indicates that when the Oregon legislature meant to refer to an assessment of tax limited, for example, to an amount of refund claimed, it spoke of an action to "reduce" a claim for refund—as is done in ORS 314.410(3)(c)—or an "adjustment" that would "decrease the amount of the refund claim" as is done in ORS 305.270(3). However, when an assessment of tax was not so limited, and went beyond the amount of a refund claimed, the Oregon statutes speak of a "deficiency," the ultimate assertion of which is an "assessment." *See* ORS 314.410(3)(c) ("give notice of a deficiency" and ORS 314.410(4) ("tax deficiency must be assessed") Further, ORS 305.270(3) speaks of the reduction of a refund claim as an "adjustment" up to the point that the "adjustment" goes beyond reduction of a refund claim and seeks recovery from the taxpayer. At that point, the action is referred to as "the finding of a deficiency." That distinction in Oregon law is not just nomenclature. It has procedural consequences, as can be seen by comparing ORS 305.270(5) (adjustments to refund claims without assertion of a deficiency) and ORS 305.270(6) (adjustments to refund claims that result in the assertion of a deficiency).

The court has no difficulty concluding, given the overall statutory context in which ORS 314.410(3)(b) finds itself, that when the legislature refers to an "assessment of

tax" whether an assessment by Oregon or by another government, the reference is to a demand for a payment limited by nothing other than the facts present in any given year. It is not a demand limited by relevant law to some lesser amount such that, for example, the assertion of tax due serves only as a reduction, off-set or elimination of a claimed refund.

The question then is whether, when the federal action on which the department relies here—the reduction of the loss amount applicable to the 1999 year—was taken, the federal government could have assessed or asserted a deficiency in excess of the amount of refund claimed. The answer is that no such positive assessment of tax or deficiency could have occurred. At the time the federal action occurred, the federal statute of limitations for the assessment of deficiencies in respect of 1999 had run.[7] Under IRC section 6501(k) the federal government could only recover up to the amount of tax refunded to taxpayer under the tentative carryback provisions of IRC section 6411, but no more.[8]

Therefore, applying the provisions of ORS 314.410(3)(b), while an adjustment or reduction of a refund claim could be made, no "assessment of tax" could have resulted from the actions of the federal officials at the time those officials took the actions on which the department relies. The "assessment of tax" prong of ORS 314.410(3)(b) does not help the department.

The only remaining question is whether, at such time, a refund of tax could have resulted from the actions of the federal officials. There is no question that the issuance of a federal refund to taxpayer was not the product of any action of a federal official with respect to the 1999 tax year. The refund was solely a result of changes made for the 2002 year, the application of the *mandatory* loss carryback provisions of IRC section 1212 and the extended time for refund provisions of IRC section 6511(d)(2).

---

[7] At the time of the federal action in 2005, the basic three year statute of limitations period under IRC section 6501 (measured from the date of filing of the return in February 2001) had run and there was no agreement between the taxpayer and the IRS extending the statute of limitations.

[8] Under IRS section 6501(k) the amount could, in some instances, be less if other assessments were also allowed. IRC § 6501(h) or (j).

Recall that given the "corresponding tax year" language of ORS 314.410(3)(b), the focus here is on the 1999 year. The test question is whether a refund for that year was the "result" of an action of a federal official. It was not. The proof of this point is easily seen by noting that a federal refund would have been due to the taxpayer in this case, even if there had been no "change or correction" by federal officials, either for the 2002 year or the 1999 year, or both. The refund did not come "as a result" of an action of a federal official.[9]

Without doubt, federal substantive law is a necessary condition to the receipt of a refund, but ORS 314.410(3)(b) does not refer to federal substantive law, it refers only to changes or corrections made by federal officials, with respect to a given year, at a point in time when an assessment or refund can result.[10] In addition, as noted above, the taxpayer had no choice as to the year to which the capital loss was to be carried or in which it was to be applied. Under IRC section 1212 the loss had to first be carried back to the earliest of the three years preceding 2002 and only if not exhausted by such application to later years.

2.   *The 2002 tax year*

The change or correction was a result of action taken in respect of tax items in the 2002 year. Giving effect to the provisions of ORS 314.410(3)(b), the only deficiency that would be allowed for the department under ORS 314.410(3)(b) would be for the "corresponding year," namely 2002. There was a change or correction for the 2002 year that had a consequence in the 1999 year. However, the Oregon legislature tied the year for which a change or correction is made by federal officials to the same Oregon tax year for purposes of determining the timeliness of actions of the department. Had the legislature intended to authorize the department to have broad deficiency authority in any year in which a federal change or correction for a different year could have a "consequence," it could have said so. It did not.

---

[9]  The amount of refund was affected, but that was by action taken in respect of the 2002 tax year.

[10]  Indeed, the reference in ORS 314.410(3)(b) is not to federal substantive law, but only to provisions of federal law governing time limits on deficiency assessments.

Throughout ORS 314.410(3)(b) the statutory text links a federal change or correction to a result occurring in one year for which one particular change or correction is made. The concept is singular—there is a change or correction in year A and that must lead to a deficiency or refund for year A. The statutory language does not admit of a construction in which a change or correction in year A results in a consequence in year B. Thus, ORS 314.410(3)(b)(A) talks of "the" corresponding year and not any year or years. Likewise, ORS 314.410(3)(b)(B), discussing the scope of deficiency authority under the statute, speaks of a deficiency that arrives at the correct Oregon liability "for *the* tax year for which the federal *** change or correction is made." (Emphasis added). The statute does not talk of correct Oregon liability in any year that is affected by the federal change or correction.

In application to the facts of this case, there is no question that the change or correction on which the department relies was the reduction of the amount of capital loss for the 2002 year. Had it not been made, there would be no basis for even considering the provisions of ORS 314.410(3)(b).[11] Accordingly, the authority of the department is limited to deficiencies with respect to that year: 2002. It is the year corresponding to the year of the federal change on which the department relies. No such deficiency was asserted for the 2002 year by the federal government. ORS 314.410(3)(b) does not authorize the department to assert a deficiency in the 1999 year based on federal action for 2002.

The foregoing construction does not render any provision of ORS 314.410(3)(b) without meaning. As to any given year, action of a federal official in the nature of a change or correction for that year, whether it produced a deficiency or a refund, would serve as the predicate action called for by the statute. As to that year, but no other, the Oregon limitations period would not run until two years following the report of the federal action.[12]

---

[11] Recall that the basic statute of limitations of three years had run and the department had no other statutory provision or agreement with the taxpayer providing for any additional time within which to act.

[12] Of course, a different year affected by a change in year A might also be open to assertion of unlimited deficiencies by reason of the application of federal

Of course, the federal change or correction would most probably have to occur within the time permitted for such action under the federal statute of limitations provisions. However, that fact is one which, as will be discussed below, is perfectly in line with how ORS 314.410(3)(b) has developed over time as a result of case law and legislative action.

B.   *Legislative History and Development of ORS 314.410(3)*

The department suggests that the Oregon legislature intended ORS 314.410(3)(b) to permit unlimited deficiency assessments by the department in years otherwise closed under the federal and Oregon statutes of limitation where federal officials adjusted the amount of a loss carryback to such closed year. The analysis set forth above demonstrates that such a result is not justified by an analysis of the actual provisions of the statute. The statutory and legislative history of ORS 314.410(3) and relevant case law is consistent with the construction that the court has given to the statute and it is to this history that the court now turns.

The discussion of statutory and case law begins with the decision in *Swarens v. Dept. of Rev.*, 320 Or 326, 883 P2d853 (1994). The Oregon Supreme Court in *Swarens* approached the proper construction of ORS 314.410(3)(b), the same statute at issue here. An appropriate analytical approach is to determine whether the department's notice would have been timely under the statutes applicable in and the logic of the *Swarens* decision and, if not, whether any subsequent case law or statutory enactment would provide the missing support for the action of the department.

1.   *Validity under Swarens*

*Swarens* stands clearly for the proposition that the federal action referred to in ORS 314.410(3)(b) must be taken within the time period that a deficiency notice, under *Oregon* law, could have been issued—without regard to the provisions of ORS 314.410(3)(b) itself. As the Supreme Court stated:

---

or Oregon statutory provisions to *that* year A or action for *that* year A by a federal official that resulted in a refund. Such a year would not, however, be opened by reason of actions for a year in respect of which a change or correction was made.

"We conclude that, under ORS 314.410(3), a correction by
the IRS extends the statute of limitations only if that cor-
rection is made before the *state* statute of limitations has
run."

*Swarens*, 320 Or at 335. (Emphasis added.)

In analyzing ORS 314.410(3)(b), the court in
*Swarens* also considered the provisions of ORS 314.380 that
both describe certain actions that may be taken by federal
officials and specify certain reporting responsibilities of
Oregon taxpayers when such actions are taken. However,
that analysis of ORS 314.380 was only done for the purpose
of reviewing the context in which ORS 314.410(3)(b) was
found. *See Swarens*, 320 Or at 332-33. Although notifica-
tion to the department is referred to in both ORS 314.380
and ORS 314.410(3)(b), nothing in ORS 314.380 serves
to expand whatever time limitations on *federal* action are
found in ORS 314.410(3)(b).[13]

Here the federal actions on which the department
relies—the reduction of the amount of capital loss in 2002—
occurred in 2005, more than three years after the filing of
the Oregon return. There were no agreements between the
taxpayer and the department extending the time for the
assessment of deficiencies. The department does not invoke
any other provision of ORS 314.410 or federal law in support
of its assessment.

Finally, as has been determined above, the action
taken by the federal officials in respect of 1999 was the
reduction of a refund claim and not an "assessment of tax."
When *Swarens* was decided, ORS 314.410(3)(b) was acti-
vated only in the event that federal actions resulted in the
assessment of a tax. *See* 320 Or at 331-32. Accordingly, if
the statutes and logic applicable in *Swarens* were applica-
ble here, the action of the department against this taxpayer
would be time barred for the reason that the relevant federal

---

[13] If ORS 314.380 requires a report, the failure to file will, if ORS 314.410(b)
applies, yield an adverse consequence for the taxpayer as to measurement of the
limitations period—but no estoppel arises. The department suggests that certain
language in *U.S. Bancorp v. Dept. of Rev.*, 17 OTR 232 (2003) should result in
some estoppel of taxpayer. *See* 17 OTR at 245. However, comments made there
had to do with burden of proof.

actions took place at a time beyond the time limit for deficiencies under Oregon law.

The logic of *Swarens* has not been altered, but legislative changes to ORS 314.410(3)(b) have occurred, and to those actions the court now turns.

### 2.  *1997 Legislation*

In response to one aspect of the decision in *Swarens*, the 1997 legislature amended ORS 314.380 and ORS 314.410(3)(b). Or Laws 1997, ch100, § 3. These amendments were included in Senate Bill 165. The changes made to ORS 314.380 and ORS 314.410(3) were, in relevant part, as follows:

"(2)**(a)**   If the amount of a taxpayer's federal taxable income, **tax credit or other amount taken into account in determining the taxpayer's federal tax liability as** reported on a federal income tax return for any taxable year is changed or corrected by the United States Internal Revenue Service or other compentent authority, resulting in a change in the taxpayer's [*net*] **taxable** income [*which*] **that** is subject to tax by this state **or in the taxpayer's tax liability paid to or owing this state**, the taxpayer shall report [*such*] **the** change or correction [*in federal taxable income*] to the department. **The report shall either concede the accuracy of the determination or state wherein the taxpayer believes it to be erroneous.**

"* * * * *

"(3) * * * **(b)**   If the Commissioner of Internal Revenue or other authorized officer of the Federal Government makes a **change or** correction [*resulting in a change in tax for state excise or income tax purposes*] **as described in ORS 314.280(2)(a) and, as a result of the change or correction, an assessment of tax is permitted under any provision of the Internal Revenue Code**, then notice of deficiency under any **state** law imposing tax upon or measured by income for the corresponding tax year may be mailed within two years after the department is notified by the taxpayer or the commissioner of [*such*] **the** federal correction, or within the applicable three-year or five-year period prescribed in subsections (1) and (2) of this section, respectively, whichever period expires the later."

Or Laws 1997, ch 100, § 3. The legislative history and committee discussions of SB 165 indicate clearly that the amendment to ORS 314.410(3)(b) was to change the time limit for federal action so that federal changes made within the time limits of *federal law* would serve to trigger the "two years after notification" rule of ORS 314.410(3)(b). This change was effected by adding references to "taxable income" in ORS 314.410(3)(b) and removing the pre-existing reference to Oregon excise or income tax. The prior reference in ORS 314.410(3)(b) to changes in *Oregon tax* rather than *taxable income* had been an important textual foundation for the holding in *Swarens* that federal changes had to occur within *Oregon* time limits. *See* 320 Or at 331-32. After the amendment, the federal change triggering the expanded time period in ORS 314.410(3)(b) could occur within *federal* rather than *Oregon* time limits.

Hearings in the Senate make it abundantly clear, however, that the basic rule of *Swarens* was not changed— there was a time limit on the predicate federal action that could make ORS 314.410(3)(b) applicable. Federal action taken beyond that time limit could not serve to "re-open" or keep open Oregon years. However, the "applicable" statute of limitations for the federal action would be the federal time limit and not, as under *Swarens*, the Oregon time limit.

This limited scope of the changes was carefully documented by one member of the Senate whose law firm had been involved in the *Swarens* litigation. As the representative of the department testified when asked specifically about the effect of the legislation on the *Swarens* decision:

> "The point that the department is trying to make, or the thing that we'd like to modify in section 3 in senate bill 165 with regard to Swarens is not to overturn the Swarens case. In the Swarens case, the taxpayer was dealing with the federal government and the federal government waited too long to bill. They, for whatever reason, they made their adjustments and they waited too long to bill the taxpayer and actually issue an assessment. So the federal government sent the taxpayer a notice of informational changes only, but didn't bill, because it was past the statute of limitations. When the Department of Revenue got the notice we thought that our statute was still open on it, because it

was extended by the federal statute, and it didn't run until we got a copy of the final notice. We built off of it. When it went to court, the court told the Department of Revenue that we don't have the ability to bill those because the statute wasn't open for federal government and we don't have any problem with that. We agree with that. The part that we're trying to address here in this particular section is that the tax court seemed to intimate that the Department of Revenue didn't have the ability to bill unless our normal statute, or normal 3 year statute, was open, not extended by any federal audit. We believe that our statute and the statute supports that our statute is open by the action of the federal government on the taxpayer where it wouldn't open it or something that was already closed by the federal statute, but only if it was still open by the department. So we're not trying to overturn *Swarens*, we're just trying to clarify one piece of it."

While this testimony is not a model of clarity, the court has no doubt that the department, in response to pointed and specific questions as to the effect of the amendment upon the holding in *Swarens*, was telling the legislature that the proposals it was making would not affect the basic holding of *Swarens*. Rather, the language would permit changes made by federal agents within federal limitations periods to be the federal action triggering the "two years after notification" rule of ORS 314.410(3)(b). What is absolutely clear is that the department gave no indication to the legislature, and the legislators in the Senate hearing in no way indicated, that federal action taken after federal limitations had run could serve to re-open, under ORS 314.410(3)(b), otherwise closed Oregon years.

Therefore, as of the effective date of these amendments, the actions of the federal government in this case, taken as they were after the expiration of the federal statute of limitation for assessment of tax in 1999, could not serve as the basis for timely department action under ORS 314.410(3)(b) with respect to the 1999 Oregon tax year.

3.  *2001 Legislation*

In the 2001 legislative session, HB 2274, which became Oregon Laws 2001, chapter 9, made changes to ORS 314.380 and ORS 314.410(3). The changes to ORS 314.380

expanded the requirements to report to the department in the case of actions taken by the taxpayer or the failure of the taxpayer to file returns with other tax authorities and permitted the department to treat the report as a claim for refund in certain cases. However, the court is not concerned with reporting requirements. This is because failure to comply with those requirements, while it may extend the exposure time of a taxpayer assuming timely federal changes have been made, does not lengthen or redefine the time limits for federal action under *Swarens* and the 1997 legislation. Rather, the court is concerned with the effect, if any, of the 2001 legislation on ORS 314.410(3)(b), the provision upon which the department bases its assessment.

In 2001 the full text of what is now ORS 314.410(3)(c) was added. It provides:

> "If the taxpayer files an original or amended federal or other state return as described in ORS 314.380(2)(a)(B), the department may reduce any claim for refund as a result of a change in Oregon tax liability related to the original or amended federal or other state return, but may not give notice of a deficiency for an adjustment to Oregon tax liability following the expiration of the applicable period prescribed in subsections (1) and (2) of this section and paragraph (a) of this subsection."

Or Laws 2001, ch 9, § 5. That change first makes reference to ORS 314.380 (2)(a)(B) for the type of taxpayer action to which it refers. The provision goes on to say that if such action results in a claim for refund, the department is limited in the extent to which it may go beyond reducing that claim to the stage of affirmatively assessing additional tax. The added provision states that such an affirmative assessment of a deficiency may occur only as to years still open to assessment under subsections (1) and (2) of ORS 314.410 and paragraph (a) of subsection (3) of the same statute.

The parties spend considerable energy in debating the significance of new paragraph (c) of ORS 314.410(3) and its reference to ORS 314.380(2)(a)(B), particularly the phrase "that is accepted by the Internal Revenue Service" as qualifying the reference to "an original or amended federal" return. The phrase can only serve a role in the application

of paragraph (c). It does not modify or qualify paragraph (b), the statutory provision on which the department relies in its arguments. Therefore no further consideration of that phrase is needed at this point.

In 2001 three changes were made to ORS 314.410(3)(b). The first added the words "or issuance of a refund" describing the types of federal actions that, under ORS 314.410(3)(b) could serve to potentially extend the Oregon statute of limitations. The second change clarified that for federal changes, the relevant time period was not limited only to one permitted under federal law, but also included periods extended by agreement with the federal government.[14] The third change stated that deficiencies issued pursuant to the section could assert any adjustment necessary to arrive at the correct amount of Oregon taxable income and Oregon tax liability.

Of those three changes, the court is not concerned with the second. In this case there was never an agreement between taxpayer and the federal government extending the time within which the IRS had to issue a notice of deficiency. Nor is the court concerned with the third change as it describes the scope of Oregon deficiency assessments if, but only if, they are timely made. The question therefore is only what, if any, alteration in the state of the law was intended by reason of the addition of the words "or issuance of a refund" to ORS 314.410(3)(b) and whether the assessment here was timely made.

On this question, the legislative history of the bill amending the statute is instructive, although almost all of the material from the committee of the House of Representatives deals with unrelated matters. However, the bill was introduced to the relevant committee in the House of Representatives by a staff person as a bill containing changes proposed by the department and addressing "some tax fairness issues." (Audio Recording, House

---

[14] It is not clear to the court why this provision was needed as extension agreements are contemplated in the federal limitations statutes and the extended period agreed to would seem clearly to be one as to which an assessment of tax or refund would or could be "permitted under any provision of the Internal Revenue Code"—the preexisting language. *See* ORS 314.410(3)(b) (1999).

School Funding and Tax Fairness/Revenue Committee, HB 2274, Jan 19, 2001, at 1:21 PM (statement of Ed Waters, Economist, Legislative Revenue Office).)[15]

In the Senate Revenue Committee, the department witness summarized for the committee the basic statute of limitations provisions in Oregon tax law and the effect of the *Swarens* decision and the 1997 legislation on those provisions. That testimony was completely consistent with the descriptions discussed above and in no way indicated that adoption of the bill would cause any departure from the principles of the *Swarens* decision, as altered by the 1997 amendments to ORS 314.410(3)(b). The witness then stated, as to the amendment proposed:

"What we're doing this time is clarifying. We have some difficulty in the language as to whether or not we can issue a refund based on that federal audit report. It seems clear that we can issue a deficiency but if the taxpayer actually has a refund coming it's not clear in the words in the statute that we can issue that refund, and we think it's fair to go either way. If the taxpayer owes more tax, we should be able to issue a bill. If they are entitled to a refund, we should be able to issue a refund based on that report. So that's what we are trying to do in sections 4 through 7."

Nothing further was provided to the committee by the department representative as to the meaning of the amendment the department desired to have adopted. The Chair of the committee summarized the amendment as follows:

"Really what the bill apparently does is open up the potential for Oregon Department of Revenue to take action if there's been an action at the federal level *during an open year*."

(Emphasis added.) Based on this legislative history, the court must conclude that the 2001 Legislature did not intend to make any change to the time limitation rules as they stood after the *Swarens* decision and the 1997 amendment.

---

[15] In its briefing on the 1995 revisions to ORS 314.665(6), the department argued that the court could take into account "staff measure summaries and analyses" prepared by legislative staff. On this his same principle the court sees no reason not to consider statements made by legislative staff members during committee hearings.

The addition of the phrase "or issuance of a refund" to ORS 314.410(3)(b) was described to the Senate committee as one working in favor of taxpayers and designed to achieve fairness by clarifying that federal actions producing refunds could lead to Oregon refunds. But as the department witness assured the committee, the question of deficiencies was already covered. Of course the law covering the matter was the statute as interpreted by *Swarens* and changed slightly by the 1997 legislation.

The court cannot conclude that the addition of a reference to "issuance of a refund" had the effect of reversing the *Swarens* principle—the principle that federal changes referred to in ORS 314.410(3)(b) must be made within, as clarified in 1997, the federal statute of limitations. No one testified or could have understood that the proposed phrase referring to refunds would open otherwise closed years in Oregon to deficiency assessments by the department when federal action, of whatever type, was taken after the federal time limitation or deficiency assessments had expired.

C.   *Other Considerations*

The result reached here is consistent with the text of ORS 314.410(3)(b) considered by itself and in the context of Supreme Court case law interpreting that statute and legislation adopted within the context of that Supreme Court case law. The result also does not condition the substance of Oregon results on technical differences or completely accidental occurrences. The court says this because the result for which taxpayer contends could have been secured without question if taxpayer had followed a permitted, but slightly different, federal procedural route on the same substantive facts.

With the filing of its 2002 tax return, showing a capital loss, taxpayer could have waited until the audit of that return was completed by the federal government. The time period to claim a refund in the 1999 year would have been extended by ORS 314.415(5) so as to include the time within which the federal audit of the 2002 year in fact occurred here—even though the general statutes of limitation on the 1999 year had expired. Upon the completion of the federal audit, taxpayer could then have simply taken action

under ORS 314.410(3)(c) by filing an amended return for the 1999 year consistent with the amount of loss allowed in the audit. That return would certainly be "accepted" under any construction of that word. At that point, a notice of deficiency could only have been issued by the department under ORS 314.410(3)(c), within the periods of time "prescribed in subsections (1) and (2) of [ORS 314.410] and paragraph (a) of [ORS 314.410(3)]". None of those time periods were open. The three year period of subsection (1) had run, there was no assertion of substantial understatement of income so as to make subsection (2) applicable and there has been no assertion of a false or fraudulent return as described in subsection (3)(a) of ORS 314.410.

The result would then have been that the provisions of ORS 314.410(3)(c) would have fit "like a glove" and the department would have been permitted to reduce the claim for refund for the 1999 year but would not have been permitted to assess the deficiency it did in this case.[16]

The only difference in fact in this case when compared with the foregoing hypothetical is that in this case taxpayer took advantage of the tentative refund provisions of federal law, which have no counterpart under Oregon law, and then later repaid a portion of the tentative refund after the federal audit of 2002 was completed. No change in the substance of the federal action in reducing the amount of capital loss in 2002 occurred. Given the principle of *Swarens* and its continued vitality through the legislative changes made in 1997 and 2001, the court simply cannot conclude that the Oregon legislature intended to have a taxpayer in the position of this taxpayer suffer such substantial differences in exposure to deficiency assessment based on such minor and permitted options as to what is employed at the federal level process. The way to give effect to that conclusion is to further conclude that on these facts the provisions of ORS 314.410(3)(b) do not apply and the provisions of ORS 314.410(3)(c) do apply.

The department had opportunity to audit 1999 and did. It had opportunity to adjust 2002 and it did not; 1999 is

---

[16] Because ORS 314.410(3)(a)(B) applies.

only possibly in play because 2002 affects 1999 under provisions of federal law and Oregon law, the purposes of which are to benefit the taxpayer. Nor does the carryback expose the department to any risk of taxpayers gaming the system. In theory neither the department nor any taxpayer expect carryback, or if they do both have the same information. When the carryback item is generated the department has already most often had the opportunity to audit the years effected by the carryback and, if it felt it needed more time, an opportunity to get an extension agreement. For the year the carryback item is generated, the department has its full panoply of tools to give it adequate time to insure the carried loss is in the correct amount. It can rely on the three year rule or if more is needed, get an extension agreement.[17] And it has the protection of ORS 314.410(3)(b) insofar as it wants to let the IRS go first.

What the department is seeking here is a windfall ability to reopen 1999 for a second audit because of a change in the 2002 year. That change is one in respect of which it is fully protected from taxpayer overstatement. It is claiming that because the loss from 2002 passes through to 1999, changes to 2002 are treated as passed through to and become changes to 1999. It does not need its arguments to have the ability to offset other deficiencies so as to potentially reduce or eliminate the statutorily authorized refund claim. It has that under *Smurfit Newsprint Corp. v. Dept. of Rev.,* 14 OTR 434 (1998), and ORS 314.410(3) (c). Rather, it wants the advantage the legislature provided to taxpayers in the form of carryback provisions to magically turn from a beneficial carryback refund claim to a drastic burden arising because any adjustment to the carryback and reduction of refund amount by the federal authorities will reopen the 1999 year to deficiency assessments without limit.

The court does not understand taxpayer to argue that, pursuant to ORS 314.410(3)(c) or otherwise, the department is precluded from taking action as to the 1999 year that could reduce or eliminate the refund claimed for that

---

[17] Of course if a taxpayer refused to extend time limits the department could make a protective assessment to preserve its rights.

year. Nor does taxpayer argue that adjustments made by the department must only be as to the amount of loss actually generated in 2002. Taxpayer appears to accept that, to the extent of the refund claimed for 1999, the department may take action to offset the refund claim under on any basis. The department has done so and to that action the court now turns.

D.    *Calculation of Sales Factor*

The question is the substantive validity, or invalidity, of the department's assertions as to the tax consequences of transactions that occurred in 1999. The position on which the department substantively bases all of its actions relates to the calculation of the sales factor used for apportionment of income in 1999.

The reduction or elimination of the refund request of taxpayer for the 1999 year depends on whether and how the receipts from the sale of the goodwill by taxpayer in that year are included in the sales factor for apportionment purposes. The relevant statute is ORS 314.665(6) (1999), which provides:

"For purposes of this section, 'sales':

"(a)   Excludes gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity.

"(b)   Includes net gain from the sale, exchange or redemption of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income.

"(c)   Excludes gross receipts arising from an incidental or occasional sale of a fixed asset or assets used in the regular course of the taxpayer's trade or business if a substantial amount of the gross receipts of the taxpayer arise from an incidental or occasional sale or sales of fixed assets used in the regular course of the taxpayer's trade or business. Insubstantial amounts of gross receipts arising from incidental or occasional transactions or activities may be excluded from the sales factor unless the exclusion would

materially affect the amount of income apportioned to this state."[18]

The department has adopted rules regarding the computation of the sales factor and the particular issues surrounding how to treat receipts from the disposition of intangible property. A review of the statutes and the department's rules, together with the legislative history of the statutory provisions and parallel developments in case law is necessary: In this process the court will first determine whether ORS 314.665(6)(a) or (6)(b) apply to sales of goodwill. The court will then consider the role, if any, of ORS 314.665(6)(c) in this matter. Finally, the court will consider the application of OAR 150-314.665(4)(3)(b).

E.  *ORS 314.665(6)(a) and (6)(b): Actions of Court and Multistate Tax Commission Regarding Treasury Function Receipts*

The provisions of paragraphs (a) and (b) of subsection (6) of ORS 314.665 and related rules were adopted in reaction both to the decision in *Sherwin-Williams Co. v. Dept. of Rev.*, 14 OTR 384 (1998), *aff'd*, 329 Or 599, 996 P2d 500 (2000) and recommendations of the Multistate Tax Commission (MTC). The actions of the MTC are especially significant as it is the organization charged with helping to ensure uniform treatment under the Uniform Division of Income for Tax Purposes Act (UDITPA), a uniform law that, subject to certain modifications not at issue in this case, Oregon has adopted.[19]

The actions of the courts, the legislature, and the MTC referred to above dealt with the problem of the proper sales factor treatment of so called "treasury function" gross receipts, about which a brief discussion is appropriate. Recall that the sales factor looks to all gross receipts of the taxpayer not allocated under ORS 314.615 to ORS 314.645. ORS 314.610(7). Prior to the developments discussed

---

[18] See footnote 1 as to two statutes of limitation applicable in this case.

[19] Our Supreme Court has shown particular concern for the goal of uniform treatment under the provisions of UDIPTA, and our Supreme Court's holdings on questions of proper and uniform interpretation of UDITPA have led to promulgation of proposed regulations by the MTC. *See Atlantic Richfield Co. v. Dept. of Rev.*, 300 Or 637, 717 P2d 613 (1986) and MTC Proposed Reg. IV.11.(a).

here—in particular the addition of subparagraphs (a) and (b) to ORS 314.665(6), those statutory provisions meant that a company buying and selling large quantities of financial instruments in connection with the cash management functions of the company would have extremely large gross receipts from the sales of intangibles. In some cases companies would buy and sell, on a daily basis, hundreds of millions of dollars of short term instruments, producing hundreds of millions of dollars of gross receipts—even though the net gain on such transactions could be very small. As the income producing activity associated with the treasury function activity occurred, typically, at the headquarters of the company, the numerator of the sales factor for the headquarters state would have, some felt, an improperly large number in the numerator of sales factor. That would, in the minds of some, skew the apportionment of income of the company to the headquarters state.

The department was one party holding the view that treasury function gross receipts could be highly distortive in the apportionment process. Feeling this way, the department proceeded, by construction of its existing rules, to take the position that only the net gain from the sale of intangibles, and not gross receipts, were includable in the determination of the sales factor. In *Sherwin Williams* this court concluded that the position of the department was inconsistent with the statutory definition of sales—a definition tied to gross receipts, not net gain or income. 14 OTR at 388-89. The court invalidated the deficiency proposed by the department for the 1987 through 1992 years. The Supreme Court affirmed in a *per curiam* opinion. *Sherwin-Williams*, 329 Or at 600.

As noted, the years at issue in *Sherwin Williams* were the 1987 through 1992 years. During the pendency of the dispute resolved ultimately against the department, the legislature, in 1995, added what is now paragraph (a) to subsection (6) of ORS 314.665. *See* Or Laws 1995, ch 176 § 1. A review of the legislative history of that action indicates that the department presented the legislature with a statutory response to a narrow problem, namely the problem of treasury function gross receipts. The response was

to eliminate from the sales factor gross receipts and *any* income attributable to trading in intangibles unless trading in such property was the primary business of the taxpayer. The department represented to the legislature that the legislative change was to provide legislative authority for the department's then existing practices. The legislative record does not contain any indication that department proposal went beyond treatment of treasury function receipts or addressed the receipts from all sales of intangible property.

After the adoption of what is now paragraph (a) of ORS 314.665(6), the world was divided into two hemispheres as to this question. In one hemisphere were those companies whose primary business involved the sale of intangible assets—for example, firms trading securities for their own account. For those companies gross receipts would continue to be considered in the calculation of the sales factor. However, for all other companies, the results of sales would not be taken into account *in any way* in the calculation of the sales factor.

In approximately 1997, just before the decision of this court in *Sherwin Williams*, the MTC addressed this matter and recommended a model regulation dealing with what had become the relatively widespread problem of treasury function transactions. The position of the MTC was similar to that achieved in Oregon with the 1997 addition of paragraph (a) to ORS 314.665(6) in that companies whose primary business involved the sale of intangible assets would have gross receipts considered in the determination of the sales factor. *See* MTC Proposed Reg. IV.15.(a)(1). However, the position of the MTC differed from what Oregon had done in that, under the MTC proposal, other companies would have sales of treasury function intangibles considered *to some extent* in the calculation of the sales factor. The extent would be the net gain from such sales, but not the extremely large gross receipts from such sales. MTC Proposed Reg. IV.18.(c).(4)(A).

The action of the MTC also focused more specifically on which assets were included in the provisions it recommended. The focus was not on all intangible property but, consistently with addressing the problem that had arisen

nationally, the treasury function management of liquid assets. Accordingly the proposed rule stated:

"(4)(A)　Where gains and losses on the sale of liquid assets are not excluded from the sales factor by other provisions under Reg.IV.18.(c)., such gains or losses shall be treated as provided in this subsection. This subsection does not provide rules relating to the treatment of other receipts produced from holding or managing such assets. If a taxpayer holds liquid assets in connection with one or more treasury functions of the taxpayer, and the liquid assets produce business income when sold, exchanged or otherwise disposed, the overall net gain from those transactions for each treasury function for the tax period is included in the sales factor. For purposes of this subsection, each treasury function will be considered separately.

"(B)　For purposes of this subsection, a liquid asset is an asset (other than functional currency or funds held in bank accounts) held to provide a relatively immediate source of funds to satisfy the liquidity needs of the trade or business. *** Stock in a corporation which is unitary with the taxpayer, or which has a substantial business relationship with the taxpayer is not considered marketable stock.

"(C)　For purposes of this subsection, a treasury function is the pooling and management of liquid assets for the purpose of satisfying the cash flow needs of the trade or business, such as providing liquidity for a taxpayer's business cycle, providing a reserve for business contingencies, business acquisitions, etc. A taxpayer principally engaged in the trade or business of purchasing and selling instruments or other items included in the definition of liquid assets set forth herein is not performing a treasury function with respect to income so produced.

"* * * * *

"(E)　Examples.

"*Example (i)*.　A taxpayer manufactures various gift items. Because of seasonal variations, the taxpayer must keep liquid assets available for later inventory acquisitions. Because the manufacturer wants to obtain a return on available funds, the manufacturer acquires liquid assets, which are held and managed in State A. The net gain resulting from all gains and losses on the sale of the liquid assets for the tax year will be reflected in the denominator of the sales factor and in the numerator of State A.

"*Example (ii).* A stockbroker acts as a dealer or trader for its own account in its ordinary course of business. Some of the instruments sold are liquid assets. This subsection does not operate to classify those sales as attributable to a treasury function."

MTC Proposed Reg. IV.18.(c).(4)(A).[20]

This 1997 proposal of the MTC was the predicate to the 1999 proposal by the department to add paragraph (b) to subsection (6) of ORS 314.665. The department witnesses in hearings on the 1999 amendments that added paragraph (b) made this clear to their audience. A comparison of the MTC proposed rule with the substance of paragraphs (a) and (b) of subsection (6) of ORS 314.665 shows that what the MTC accomplished in one rule was accomplished in paragraphs (a) and (b) of ORS 314.665(6). Firstly, traders of intangible assets would have gross receipts considered under the traditional definition of sales. This is accomplished by ORS 314.665(6)(a) and MTC Proposed Reg. IV.18.(c).(4)(C) (the phrase "unless those gross receipts are derived from the taxpayer's primary business activity" in ORS 314.665(6)(a)). Secondly, non-traders would include only net gain from treasury function transactions. This is accomplished by MTC Proposed Reg. IV.18.(c).(4)(A), quoted above, and ORS 314.665(6)(b).

Recall, however, that the focus in the MTC regulation was on only a subset of all intangible assets—liquid assets. In 1999, the department represented to the legislature that the purpose of the statutory addition was to bring Oregon in line with the states that were members of the MTC and which had adopted the Uniform Division of Income for Tax Purposes Act (UDITPA). The MTC approach was one that analytically started with a determination of whether a taxpayer was principally engaged in the business of trading liquid assets. If not, only net gain from transactions in such assets would be reflected in the sales factor. Therefore, to be synchronized with the MTC, the Oregon focus would also need to be on liquid financial assets and not all intangibles.

---

[20] The model apportionment regulations promulgated by the MTC can be found on the MTC's website at the following URL: http://www.mtc.gov/Uniformity.aspx?id=496. Follow the "General Allocation and Apportionment Regulations" hyperlink.

The department's rule interpreting the provisions of subsection (6) of ORS 314.665 state, in relevant part:

"**Sales Factor; Inclusion of Income from Disposition of Intangible Assets; Determination of Primary Business Activity**

"(1)    As provided in ORS 314.665, paragraph (6), the sales factor may or may not include gross receipts or net gains from the disposition of intangible assets, depending on what the taxpayer's "primary business activity" is.

"* * * * *

"(3)    A taxpayer's "primary business activity" is determined for a particular tax year based on consideration of criteria including, but not limited to, the following:

"(a)    The stated business in the articles of incorporation.

"(b)    The business category entered on the Securities and Exchange Commission Form 10-K of a publicly held corporation.

"(c)    The business designation in a "mission statement."

"(d)    The business activity with the greatest average investment in tangible and intangible assets from the balance sheet for the tax return.

"(e)    The business designation in advertising.

"(f)    The business with the greatest amount of net sales of product and services as reported under Generally Accepted Accounting Principles.

"(g)    The business activity from which working capital is transferred to *investments* in *intangible assets* and *to which the working capital and income is returned.*

"**Example 1**:    A Corporation (A) is headquartered in Seattle[,] Washington[,] and manufactures and sells household appliances. A has a warehouse in Portland, Oregon. It has large amounts of temporary excess working capital each year during the summer after big spring sales and before buying raw materials in the fall. Employees of A at its headquarters invest the temporary excess working capital in *short-term debt instruments* that are bought and sold each week for a three month period *before the invested principal and any earnings are returned to the working capital* of the manufacturing business. The income from the investment activity is business income. B's primary

business activity is the production and sale of tangible personal property, not the purchase of, holding of, dealing in or sales of intangible assets. A must include the net gain *from sales of short-term debt instruments in its sales factor.*

"(4)   When some criteria for a corporation indicate the primary business activity is *dealing in intangible assets* while other criteria indicate the primary business activity is the production or sale of tangible property or the provision of services, more weight will be given to criteria reflecting what the corporation actually did during the tax year as opposed to what the corporation did in the past or represents itself as doing.

"**Example 2**:   For the current tax year, over 60 percent of B Corporation's (B's) assets are invested in *intangible oil royalty rights* and over 70 percent of B's net sales come from the sale of intangible oil royalty rights. The SIC code on its last 15 corporate tax returns has been for "Oil Royalty Traders." B's 25 years old articles of incorporation and it's current advertising indicate that B is in the business of selling petroleum products. B's primary business activity is the acquisition, holding and disposal of intangible assets and it must include the gross receipts from oil royalties and the sale of oil royalty rights in the sales factor on [its] Oregon return."

OAR 150-314.665(6) (emphasis added).

"**Sales Factor: Definition of Net Gains**
For purposes of including net gains from the sale, exchange, or redemption of intangible assets not derived from the taxpayer's primary business activity in the sales factor under ORS 314.665(6)(b), "net gains" means the excess of gains over losses from asset sales. If the net of gains and losses results in a negative amount, the correct amount for factor purposes is zero.

"*Example 1*:   Heavy Equipment Manufacturing Corporation (Heavy) sold two *short-term investments in commercial paper* during calendar tax year 2000. The first sale resulted in a net gain of $100,000, and the second resulted in a net loss of $30,000. The income from selling the commercial paper was not derived from Heavy's primary business activity of manufacturing, and Heavy must include net gain of $70,000 ($100,000 gain less $30,000 loss) in the sales factor.

> "***Example 2***:   Assume the same set of facts as in Example 1, except that the first sale resulted in a $100,000, loss and the second sale resulted in a $30,000 gain. The net result of sales of intangible assets not derived from the taxpayer's primary business activity is a negative amount, so no amount of net gain from sale of intangible assets is included in Heavy's sales factor."

OAR 150-314.665(6)(b) (emphasis added). If one considers how the department interpreted the legislation it recommended to the legislature, legislation that is closely analogous to the MTC regulations, and the explanations the department gave to the legislature about the amendments being proposed, the court is of the opinion that the proper construction of subsection (6) is that the statute deals only with the type of intangibles outlined in the MTC regulation and the examples provided by the department in Example 1 and Example 2 of OAR 150-314.665(6). Those intangibles are so-called liquid assets or financial instruments. Nothing in the historical context of the relevant legislation, the case law, the actions of the MTC or the reactions of the department and the legislature to such actions by the courts and the MTC in any way suggests that subsection (6) was meant to apply to an intangible asset such as goodwill.

To the contrary, the rules of the department suggest that goodwill is not the type of asset addressed in the statute. For example, the rules specify how "net gains" from the type of assets addressed by the statute are to be calculated. The calculation is done by subtracting losses from sales, exchanges or redemptions of intangible assets from gains in the same period from the sale, exchange or redemption of such assets. Only a positive result enters into the factor. This provision and the related example indicates the statutory provision applies to assets in respect of which taxpayers could and would engage in multiple transactions involving the intangibles covered by the statute, with some potentially producing gain and some potentially producing loss. This calculation provision in no way fits a disposition of goodwill. Goodwill is measured and disposed of, typically, in connection with the disposition of all of the assets of a business or line of business. There is only one transaction. Yet the department rule contemplates netting gains against

losses and gives as an example regular and multiple numbers of transactions in intangibles in any given year. The inference the court draws is that the department rule correctly interprets the intent of the statute and that neither the statute nor the rule apply to the disposition of goodwill in connection with the disposition of other assets.

Further, to construe ORS 314.665(6)(a) and (6)(b) as proposed by the department would immediately put Oregon out of step with the MTC rule, the very same rule that was adopted so as to produce uniformity among member states. The department told the legislature that the adoption of paragraph (a) dealt with the *Sherwin Williams* "problem" and that the provisions of paragraph (b) would bring Oregon into coordination with the MTC rules. Those rules only deal with liquid treasury function assets.[21]

The court concludes that neither ORS 314.665(6)(a) nor (6)(b) can be a basis for including some or all of the receipts from taxpayer's disposition of goodwill in the computation of the sales factor. Goodwill is not the type of intangible property that those statutory provisions address.

F.   *ORS 314.665(6)(c)*

As quoted above, ORS 314.665(6)(c) excludes from the sales factor "receipts from the incidental or occasional sale of a fixed asset or assets" used in the regular course of the taxpayer's trade or business.

The department has adopted a rule in this regard, OAR 150-314.665(1)-(A)(2) that provides:

> "(a) Where substantial amounts of gross receipts arise from an incidental or occasional sale of a fixed asset used in the regular course of the taxpayer's trade or business, such gross receipts will be excluded from the sales factor. For example, gross receipts from the sale of a factory or plant will be excluded.

---

[21] Both the MTC regulation and ORS 314.665(6)(a) also address traders in intangibles, but no party argues that taxpayer is a trader in goodwill. Goodwill is not addressed in the MTC rule to which the department referred in its discussions with the legislature. The court cannot now conclude that the legislature intended its work to be interpreted so as to place Oregon out of compliance with the MTC rule to which it was referred by the department.

> "(b)   Insubstantial amounts of gross receipts arising from incidental or occasional transactions or activities may be excluded from the sales factor unless such exclusion would materially affect the amount of income apportioned to this state. For example, the taxpayer ordinarily may include or exclude from the sales factor gross receipts from such transactions as the sale of office furniture, business automobiles, etc."

The parties take differing views as to whether goodwill is a fixed asset used in the regular course of the taxpayer's trade or business. The department argues that an intangible can never be considered a fixed asset.[22] Taxpayer argues that goodwill can be and should be a fixed asset.[23]

The court does not consider it necessary to resolve this disagreement between the parties.[24] The reason for this is that the resolution of proper treatment of receipts from the sale of the intangible at issue in this case, goodwill, is provided by application of OAR 150-314.665(4)(3(b), to a discussion of which the court now turns.

G.   *OAR 150-314.665(4)(3)(b)*

The department has promulgated OAR 150-314.665(4)(3) that provides rules for applying the statutory directive that in the case of sales of intangible property the place where income producing activity occurs is to be used in determining how to calculate the sales factor. The rule provides:

> "(3)(a)   *Where the income producing activity* in respect to business income from intangible personal property *can be*

---

[22] Taxpayer points out that the department has changed its position on whether intangibles can be fixed assets. In *Crystal Communications, Inc. v. Dept. of Rev.*, 20 OTR 111 (2010) the department initially asserted in its briefs that goodwill was a fixed asset, but withdrew that assertion in the course of the case. Here the department asserts that goodwill, an intangible, cannot be excluded as a fixed asset under ORS 314.665(6)(c). The department's temporary litigating position in *Crystal* does not preclude it from arguing otherwise in this case.

[23] The parties appear to agree that the disposition of goodwill in this case was a result of an occasional sale so that the requirement of such a sale, found in ORS 314.665(6)(c) is satisfied.

[24] Accordingly the court does not address the taxpayer's position that application of the department's position would violate the uniformity requirements of the Oregon Constitution.

*readily identified*, the income is included in the denominator of the sales factor and, if the income producing activity occurs in this state, in the numerator of the sales factor as well. For example, usually the income producing activity can be readily identified in respect to interest income received on deferred payments on sales of tangible property (OAR 150-314.665(1)–(A)) and income from the sale, licensing or other use of intangible personal property.

"(b)  Where business income from intangible property cannot readily be attributed to any particular income producing activity of the taxpayer, the income cannot be assigned to the numerator of the sales factor for any state and must be excluded from the denominator of the sales factor. For example, where business income in the form of dividends received on stock, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities results from the mere holding of the intangible personal property by the taxpayer, the dividends and interest must be excluded from the denominator of the sales factor."

For purposes of this rule:

"The term 'income producing activity' applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit."

OAR 150-314.665(4)(2). (Emphasis supplied.)

The relevant MTC regulation is essentially the same and provides:

"Where the income producing activity in respect to business income from intangible personal property can be readily identified, the income is included in the denominator of the sales factor and, if the income producing activity occurs in this state, in the numerator of the sales factor as well. For example, usually the income producing activity can be readily identified in respect to interest income received on deferred payments on sales of tangible property (Regulation IV.15.(a)(1)(A)) and income from the sale, licensing or other use of intangible personal property (Regulation IV.17.(2)(D)).

"Where business income from intangible property cannot readily be attributed to any particular income producing activity of the taxpayer, the income cannot be assigned to the numerator of the sales factor for any state and shall be excluded from the denominator of the sales factor. For example, where business income in the form of dividends received on stock, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities results from the mere holding of the intangible personal property by the taxpayer, the dividends and interest shall be excluded from the denominator of the sales factor."

MTC Proposed Reg. IV.18.(c)(3).

The provisions of the statutes on apportionment at issue are rules applicable to sales "other than sales of tangible personal property." ORS 314.665(4). Accordingly the sales in question could be of intangible property or services.[25] The rules of the statute and department are much more easily understood and applied when, for example, the income producing activity is the performance of a service. In such a case the location of the service provider can be a strong indicator.

It is much harder to determine the income producing activity involved in the sale or other use of a more general intangible such as goodwill. The rules of the department and the MTC state that where the business income from an intangible cannot *readily* be attributed to a particular business activity of the taxpayer, the proceeds of a sale of the intangible are to be excluded from the calculation of the sales factor. In the case of goodwill, it is important to acknowledge that as an asset, it reflects the value of the combination of all the assets and activities of a business, and, under the accepted definition for accounting purposes, is the amount paid by a purchaser in excess of the aggregate fair market value of other assets purchased. "[T]he excess of the purchase price of a business over and above the value assigned to its net assets exclusive of goodwill." *Webster's Third New Int'l Dictionary* 979 (unabridged ed. 2002). Goodwill is also the product of numerous activities undertaken, usually in numerous locations.

---

[25] "Sales" can also include receipts from rental, leasing, franchising, licensing, or other use of tangible property. OAR 150-314.665(2).

Under the department's rule, therefore, the question becomes whether this "extra" amount paid by the purchaser can "*readily*" be attributed to a "particular income producing activity of the taxpayer"—that being "the transactions and activity directly engaged in by the taxpayer for the ultimate purpose of obtaining a gain or profit." "Readily" means: "with fairly quick efficiency *** reasonably fast *** easily." *Webster's Third New Int'l Dictionary* 1889 (unabridged ed 2002).

In the opinion of the court, the goodwill at issue here is a composite of all of the business activities of a taxpayer over time and in all locations where the business of the taxpayer is carried on. The factual record shows that these activities occurred throughout the world and over a significant number of years. That being the case, it is the conclusion of the court that the amount paid by the purchaser to taxpayer in this case cannot "readily" be attributed to any particular income producing activity. The net gain from the disposition of the Goodwill should not enter into the calculation of the sales factor for the 1999 year of taxpayer.

This conclusion is also supported by consideration of the role that the sales factor plays in the apportionment process. The factor does not define whether the income from the disposition of an intangible such as goodwill is taxable. That income is concededly taxable and fully included in the tax base subject to apportionment. Rather, the sales factor serves as a tool, along with other factors in certain years, to determine the nature and extent of a taxpayer's presence in and utilization of governmental services and the infrastructure of a state.

This conclusion is fully consistent with the language of OAR 150-314.665(4)(3)(a) and (3)(b). The rule, in subparagraph (a), describes as usually identifiable activity interest income on an intangible arising from a particular sale of a particular asset. This is contrasted, in subparagraph (b), with dividends and interest resulting from the mere holding of intangible personal property—stocks or bonds. Such dividends and interest are stated to be not attributable to any particular income producing activity.

Although the rule does not explain that conclusion in subparagraph (b), it is the opinion of the court that the explanation is that the cash used to pay dividends or interest is the product of all of the activities of the payor of such interest or dividends. Similarly here, the receipts from disposition of goodwill are a product of all deployments of land, labor, capital and managerial skill undertaken by taxpayer.

## V.   CONCLUSION

The motion of taxpayer as to computation of the sales factor is granted and that of department is denied. Now, therefore,

IT IS ORDERED that Plaintiffs' Motion for Partial Summary Judgment is granted; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is denied.